UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------x
                                                  :
UNITED STATES OF AMERICA          :
                                                  :
VS.                                               :          DOCKET NO: 05-cr-01036(CM)
                                                  :
DANIEL E. MARINO                      :
                                                  :
                        Defendant           :
                                                  :
-----------------------------------------------------x

### DEFENDANT DANIEL E. MARINO'S
### SENTENCING MEMORANDUM

On August 16, 2005 Dan Marino wrote what he described as a confession and suicide letter which he left in his office at Bayou (Def. Ex. A). The letter was subsequently discovered by an investor who came to the Bayou office. The FBI was notified by local police and made contact with Dan Marino in Westport, Connecticut the following day.

Mr. Marino made an immediate decision to cooperate and has done so continuously over the past 29 months. During this period he has met with members of the US Attorney's office and the FBI approximately 15 times and was extensively debriefed on each occasion. In addition, he has met with representatives of the SEC, the CFTC, the US Marshal Service Asset Forfeiture Division and spent two days with investigators of Kroll where he gave detailed information regarding the recoverability of

assets including loans and private equity ventures. In addition, Mr. Marino agreed to the forfeiture of real property he owned in Westport, Connecticut and the proceeds from the sale of two automobiles. He has been virtually penniless over the entire period of his cooperation.

From the outset, he gave substantial assistance to the government. He signed multiple consents to search thus facilitating the government's investigation and obviating the need for the government to apply for search warrants.

While Dan Marino has fully and completely accepted his responsibility for his role in this offense, it is critical to understand just how Dan Marino, an individual who had no ability to trade securities and did not ever trade securities, could have become involved with two individuals, Mr. Israel and Mr. Marquez, who traded on their reputations as investment advisors and traders. In every respect, Dan Marino was the polar opposite of both Israel and Marquez.

Dan Marino is 48 years old having been born in 1959. At age 5, as a result of developing Mumps, he suffered a complication known as meningoencephalitis, an infection of the brain, which left him with a hearing loss that is tantamount to being deaf without hearing aids. While he received special services in school to enable him to lip-read, his parents refused to allow him to learn sign language because they believed this would further isolate him from the hearing community. Dan completed high school and graduated from Wagner College on Staten Island in 1981.

2

In September of 1981 he started a job at Coopers & Lybrand as a staff accountant in the audit department at a salary of $17,500.00. During his first week at work, his father died of a heart attack. Dan left Coopers in July 1982 for a job with a two person accounting firm where he worked for the same salary. He continued there until December 1983. During that summer he underwent the first of two surgeries to his spine and was out for about one month during 1983. Although the accounting firm he joined in July 1982 consisted of a father and son, Mr. Marino saw it as an opportunity for him to plant roots where he lived and hopefully obtain new business. The opportunity did not materialize which sent him into a severe depression.

At this time he was 24 years of age and had never had a date. He viewed himself as unappealing, stupid and with very few prospects as a result of his speech impediment which he believed would not really be accepted by anybody. From January 1984 through June 1986 he joined an accounting firm with approximately 40 employees. His compensation was approximately $2500 to $4000 less than the going rate. From June 1986 through January 1991 he joined the firm of Oppenheim Appel & Dixon where he was a tax preparer and reviewer.

In the spring of 1987 he underwent his second back surgery where he suffered acute respiratory distress syndrome and was kept in an induced coma in the intensive care unit for a total of 3 days. Apparently, he had an allergic reaction to the anesthesia. His life view was that he had no real future because of setbacks in his career, and he had no social life.

Dan Marino met James Marquez in the fall of 1988 while he was working at the Spicer & Oppenheim accounting firm which was a successor to OAD. Marquez was assigned to Dan as a tax client although all tax returns would then be reviewed and signed by a partner of the firm which Dan was not. Dan Marino regarded Jimmy Marquez as one of the "Masters of the Universe", since he believed that Marquez was a trusted assistant to George Soros, a top money manager. Mr. Marino knew that Mr. Marquez had worked with Michael Steinhardt, a well known hedge fund manager. It was Marino's belief that Steinhardt was considered one of the top ten managers at the time. Marino's belief was that Marquez had produced a 35% rate of return while he was with Michael Steinhardt. In the Spring of 1990, Marquez decided to open his own fund called HMR Investors. Marino understood that Marquez had raised approximately $35 - $40 million dollars by the Spring of 1991. Marquez asked Dan Marino to leave Spicer & Oppenheim and join him in the role of an independent accountant. Marquez told Marino he would introduce him to potential clients in the hedge fund community, and Marino thought that this was a phenomenal offer for him. Marquez closed HMR by March 15, 1995.

Dan Marino became aware that Marquez was speaking with Sam Israel regarding a new hedge fund, Bayou. Mr. Marquez assured Dan Marino that any issues he had with Sam were "put to bed" and he could work with him. Marino did not know details of any past issues at the time, but he later learned that some were personal and

some were business. Although Marino had seen Marquez make large rates of return and lose as well, he viewed him as a player on Wall Street who had great ability.

During 1995 Dan Marino was invited to start working at Bayou. During the beginning of 1996, Bayou was run out of Sam Israel's basement on Buckout Road in West Harrison. Dan Marino was living in Staten Island at the time and came to Westchester two to three times a week during 1996 and 1997. His job was to reconcile the trades, report to Mr. Marquez and Mr. Israel and pay bills. Bayou remained at the Israel residence until Memorial Day 1998 when, at the insistence of Mr. Marquez, they moved to 40 Signal Road in Stamford, CT.

After a delay in producing the financials which had been promised to investors by the end of March 1998, both Marquez and Israel told Marino they wanted him out, since they blamed him for the delay.[1] Both Marquez and Israel told Marino that Sam's wife Janice was going to take over Marino's function, since she was a CPA. In June, Mrs. Israel stated she would delay starting until the end of the summer when her children returned to school. Dan Marino started to look for another job. In September 1998 they put Marino's departure off again, and subsequently both Marquez and Israel told Marino that they wanted him to stay.

---

[1] The cause of the delay in finishing the audit was twofold. First, the outside auditor believed the loss for 1997, which was the subject of the audit report in 1998, was larger than the books of Bayou reflected. Subsequently, there was recognition that the error was not in Bayou's books but rather in the work papers of the auditor. The second reason for delay in issuing the audit report was the question of whether Bayou Fund could accept commission rebates from Bayou Securities in the amount of $400,000 without footnote disclosure. It was resolved when Bayou Securities actually made the payment of funds from Securities to Bayou Fund which resulted in the reporting of a profit rather than a loss for 1997.

In late December 1998 Israel and Marquez called a meeting during which Sam Israel advised that there was a problem [losses] they could not immediately solve. Both Israel and Marquez were of the view that since Marino was an "independent accountant" and not a partner at Bayou, he should do the audit rather than risk continuation with their present auditor. This was the genesis for Richmond Fairfield as the auditor of the Bayou Fund. Both Israel and Marquez told Marino that this was a way to help save the business, their lives and the welfare of their children. Marquez told Dan he needed him to help him and that only Dan could create this second opportunity for them. Before Marino agreed, he asked Sam Israel, in writing, to collateralize real estate Israel apparently owned in Louisiana and for both Israel and Marquez to create a video tape whereby they would acknowledge that they were asking Marino to do this. Although Sam Israel agreed verbally, it was never put in writing and there was never any security posted by Israel or video tape memorial.

Every number and every report prepared by Dan Marino that left Bayou was reviewed by Sam Israel and James Marquez. Mr. Marquez and Mr. Israel determined the degree of deception that would appear in the financial reports. Mr. Israel and Mr. Marquez were very much aware that if these false reports showed too great a profit, that would create a larger gap for them to fill from future trading and commission and would also run the risk of creating a track record that they could never duplicate in the future. While Mr. Marino takes full responsibility for his participation and misrepresentations with respect to the false reports, it was Mr. Israel and Mr. Marquez who reviewed the

reports and had the ability to trade or not to trade which would result in consequences of incurring gains or losses.

In January 1999 Dan Marino was developing a severe cough. During the spring and early summer he was finally diagnosed with Hodgkin's Lymphoma with a tumor in his chest the size of a fist. In the beginning of July 1999 Dan Marino began chemotherapy. From April of that year he was out 25% of the time and by the end of July he was out 50%. During the period from August through December 1999 he was not present at Bayou at all. During this same period, Marino's mother was diagnosed with cancer and died on January 1, 2000 even while undergoing his own chemotherapy, he was the primary caregiver for his dying mother who had contracted lung cancer (Def. Ex. F).

During the second week of January 2000 Dan Marino returned to Bayou and was confronted with the ongoing antagonism and hostility between Marquez and Israel. When Marino complained about the amount of money being spent, Marquez told him that he didn't have time for such mundane conversations and walked out on him. During March 2000 Mr. Marino drove back and forth from Staten Island where he was undergoing radiation to Stamford and finally finished his radiation by the end of June. Marino moved to Stamford at the end of July 2000 and took an office across the street from Bayou in September 2000.

In July 2001 Bayou purchased 1 million shares of KFX stock and warrants to purchase 500,000 additional shares of KFX stock for approximately $3.6 million dollars.

Within a year, Sam Israel attempted to sell the KFX stock. Because it was unregistered, the transaction was not processed, and Bayou fortunately was able to buy back the KFX shares which were sold at the end of 2004 for a far greater profit of approximately $12 million dollars. Subsequently, Dan Marino was able to have the shares registered and filed with the SEC.

Marino had no idea that Marquez was receiving fees from KFX. Marino did not know that Marquez made at least $3.4 million dollars from the Bayou/KFX deal as set forth in the government's sentencing memorandum in the Marquez case. Marquez specifically told Marino that he [Marquez] was not receiving a fee from KFX.

From Marino's perspective, he was consistently depending on Marquez and Israel, and later Israel after Marquez left, to be able to trade profitably and successfully. Dan Marino never engaged in trading. All decision making with respect to trades were the responsibility of Mr. Israel and Mr. Marquez, and after Mr. Marquez's departure, Mr. Israel. Marquez and Israel were constantly antagonistic toward one another. Marino tried to mediate, but he was unsuccessful. After the departure of Marquez, there were heated disagreements between Marino and Israel resulting in the incidents described in Mr. Marino's confession and Dr. Mueller's report. (Def. Ex. A and C).

Dan Marino believed that Sam Israel had the ability to trade successfully and pleaded with him to focus on the job that needed to be done. Although Mr. Israel did have periods of success, by April 2004 Sam Israel embarked upon a course of conduct by which he completely separated himself from Dan Marino.

In April 2004 Sam Israel went to Europe to meet an individual whose name was B.N. Apparently, Mr. Israel had been referred to B.N. by an individual named J.O. In a matter of days, Sam Israel asked Dan Marino to fly to London to meet with B.N. Marino stayed one and ½ days, and after hearing what B.N. had said, Marino told Israel that he had no idea what he was talking about. At this point Marino did not know if Israel was completely crazy or just reckless. Israel assured Marino that if money were sent to Europe, Israel would make sure that it remained in Bayou's name. Marino implored him not to allow the money out of Bayou's name. After Marino left, it took Israel one week to call Dan Marino to tell him not to worry about anything and that he had complete documentation for this investment opportunity which Marino neither understood nor could comprehend. Sam Israel directed Mr. Marino to wire funds to the "humanitarian fund" at Barclay's Bank. When Dan Marino questioned Sam Israel, Sam Israel told Dan to take him at his word and that the "problem" would be solved in sixty days. Marino told Israel he could not do this anymore and further that the banks would have an issue with the wire.

When Dan Marino explained to Sam Israel that there would have to be documentation, Israel stated "F__k them it's my money" The $150 million dollars remained at Barclays Bank for approximately one month and was subsequently wired back to the United States. Although Israel told Marino that he would explain what happened, he never fully explained it. B.N. and his wife came to stay at Sam Israel's home in June 2004. In September 2004 Israel directed that funds be wired to Deutsche

9

Post Bank in Germany. Israel went back to Europe and during September and October 2004 there were no answers for Marino. At the end of November 2004 money was transferred to a brokerage house in London called ODL. Apparently, money remained at ODL through the end of March 2005 where nothing happened.

In March or April 2005 Sam Israel went to San Diego to meet with certain individuals. After that meeting, ODL wired funds to Wachovia. During the period from January to March 2005 some money came back to Bayou to pay withdrawing investors. The wire to Wachovia to the account of Majestic Capital was made in the Spring of 2005 in the amount of $100 million dollars. This was arranged by Sam Israel. These funds were subsequently seized by the attorney general of Arizona.

The funds were in an account known as Majestic Capital in a Wachovia branch in New Jersey. Marino made absolutely no decision with respect to where those funds should be invested, and the European trip and all of the activities in Europe were conceived by Sam Israel. In fact, Sam Israel told Dan Marino that he had spoken to Alan Greenspan, then Chairman of the Federal Reserve, who assured Mr. Israel that whatever Mr. Israel was planning on doing with the money was a sound investment. Dan Marino was speechless.

When Silver Creek gave notice that they wished to withdraw their investment, Dan Marino issued a $53 million dollar check on August 12, 2005 after asking Sam Israel what he should do about it. Mr. Marino told Israel that there were no funds, and Silver Creek was expecting their check. Sam Israel told Dan to write the check,

because he [Israel] would have the money there on Monday.  When Marino issued the check, of course there was no money there on Monday.  Subsequently, Dan Marino wrote what can fairly be described as a suicide note and confession which was subsequently provided to the FBI.  On the day Mr. Marino first met with the government, Mr. Israel left a voice mail on his phone which is set forth in Def. Ex. B.  The tone and content of this voice mail were characteristic of the intimidating way in which Mr. Israel treated Mr. Marino.

One cannot overstate the nature and degree that Dan Marino's isolation contributed both to his inclusion in Bayou by Israel and Marquez as well as his participation in the fraud that has brought him to the point where he has confessed, pleaded guilty and now stands before the Court for sentencing.

As Dr. Carl Mueller writes in his May 15, 2007 report (Def. Ex. C):

> At the age of 5, Mr. Marino suffered Encephalitis. This disorder was life threatening.  He pulled through but was left with a severe hearing loss.  He has required the use of hearing aids ever since.
>
> One can imagine the effects of poor hearing and the use of hearing aids on a young child.  During these years, he was frequently teased and hence became more withdrawn with a significant reduction in self-esteem.  Due to his hearing problems, he developed a speech impediment, which has burdened him severely.  He felt that people saw him as mentally retarded, as he sounded so odd.
>
> His brother David assisted him greatly in managing the torments of his hearing loss. David was the oldest brother and 6 years his senior.   David was also

11

physically large and towered over him.   It was therefore further profound for Dan, when David, at the age of 22, died abruptly.  David apparently was alone, developed a severe nosebleed and choked to death on his own blood.   This was devastating to the 16 year old Daniel.

Dr. Mueller continues:

He performed reasonably in school, but was always socially isolated and withdrawn.  He developed a pattern of problem solving, taking his own internal advice over the natural interchange of ideas with others.  He spoke little as he felt his voice made him sound stupid or bizarre.

He had few social acquaintances, some friends of utility around tasks of the day, but never any girlfriends or amorous relationships.  "If I asked 20 girls out, I would get 21 rejections".  His self-image and self esteem never developed in his early manhood.  His only substantial relationships were with his family.

Dr. Mueller continues,

When offered involvement in Bayou, he saw an opportunity to break out of his quietly desperate life….Bayou became a fixation.

The year 1999 became a seminal year for him…  He developed Hodgkin's Lymphoma in June at the age of 40.  He received chemotherapy through December of 1999 and radiation through the first part of 2000. "Again, faced with a life threatening disorder, he withdrew and stoically weathered the chemotherapy with its side effects and even further socially and emotionally isolated himself.

At this juncture, he felt it was in the nature of his life, to suffer.  He sank further into depression and had

> episodes of despair.    These episodes were also
> managed in isolation.

Dr. Mueller notes,

> ...Chemotherapy will very often cause worsening
> depression, cognitive decline and emotional blunting.
> The side effects of the chemo were also so unpleasant
> that he remained out of work for some time.

Dr. Mueller recounts the episodes of intimidation, physical and verbal abuse at Bayou

undergone by Dan Marino.

Dr. Howard Eison further documents (Def. Ex. D) Dan Marino's medical history

and continuing medical problems in his letter of November 1, 2007.  In addition to the

Hodgkin's Lymphoma which he suffered in 1999, in 2004 Dan Marino was diagnosed

with advancing coronary artery disease involving 2 of his heart's major arteries

stemming from an inherited metabolic defect which puts him at a high risk for

myocardial infarction.   In 2005 Dan was diagnosed with an early form of multiple

myeloma, a cancer of blood forming cells, which again may require chemotherapy and

requires close monitoring.   Most recently, both Dr. Eison and an oncologist have

evaluated Dan and have assessed his probability of developing full blown myeloma at

20%.

Dr. Eison noted that "[e]ven when most frightened by his serious medical

conditions, Dan remained passive and deferential to authority.  In fact, he was always

very easily convinced to follow my medical advice, and never questioned or wavered

from my recommendations.  In fact, from my perspective, Dan has a submissive personality manifest by always being very eager to please; this most likely due to his self-esteem issues given his life-long medical problems.  Although this always made my position as his physician easier, as I knew he would always do exactly what I told him to do without questioning, I often wondered how he could function in the business world, his personality being more of a follower than a leader."

During the fall of 2007, Mr. Marino lost the use of his hearing aids; they just died. Fortunately, we were able to obtain new hearings aids for him through a private fund established by a patient of the audiologist who treated Dan Marino.  The audiologist notes in her report of October 25, 2007 (Def. Ex. E):

> "Without hearing aids, Mr. Marino hears practically nothing, but even with hearing aids, his hearing is far from normal.  The feeling of isolation, of always having to strain to hear and of often guessing at what is being said, is exhausting and discouraging for people like Mr. Marino."

Also enclosed is the report of Jacqueline Swensen, (Def. Ex. F) a licensed clinical social worker who met weekly with Dan Marino for approximately 11 years.  It is her opinion that Dan Marino does not have any sociopathic tendencies whatsoever and that during the period she has seen him, he suffered from a major depressive disorder. Her conclusions are consistent with those of Dr. Mueller.

From the early 90's through 2005 and yet even today, Dan Marino has had no social life, and because of his grave and serious medical conditions, he held onto his relationship with Marquez, Israel and Bayou far longer than he should have.

It is not possible to articulate the sense of shame, guilt and contrition Dan Marino feels. In fact, his life since August 2005 has been in many respects a life of self-imposed isolation. He lives in a neighborhood of high crime, in a community of very poor people. When he left his confession in his office and began his cooperation, he moved out of the house in which he was living in Westport. He could not bear to live there, even though he could have done so throughout the period of foreclosure. While he does not seek to shift his own responsibility to someone else, he does fear that Marquez and Israel will attempt to shift their own culpability to him.

The falsification of financial reports was wrong, and Dan Marino knows it, has admitted to it and has expressed his remorse for it. But Dan Marino was not the reason people came to Bayou, and Dan Marino was not the person that investors met with in order to make decisions to invest in Bayou. Dan Marino never traded one share of stock, and it was not Dan Marino's reckless idea to fly to Europe and to engage in international financial intrigue.

Ellen Marino writes in her letter of November 9, 2007 about her own observations concerning the contributions of loss, cancer, depression that sent Dan Marino on a downward spiral until he crashed. She has known Dan Marino for over 30 years and relates the traumatic events including watching his young sister attempt to breathe life

into his 50 year old father who suddenly died in the family home and that although he suffered through the treatment of Hodgkin's disease, he was the primary caregiver to his dying mother as she slowly died from lung cancer. (Def. Ex. G). Doug Harper, who is married to Dan's sister writes about the effects of Dan's hearing loss and how he "speaks" with Dan over the internet almost nightly and how Dan regrets his actions. He notes that he has watched Dan punish himself and that this has taken a terrible toll on him. Mr. Harper expresses his hope that the Court will take the events Dan has suffered throughout his life into account and impose a just, but brief, sentence. (Def. Ex. H).

Elizabeth Marino, Dan's sister, recounts that Dan was always a law abiding and generous brother. She recalls that Dan's motivation in going to work with Jim Marquez was "to make enough money to help my mom after my father died and to help me not to have to work full time, since I had already developed a bad back after injuring myself in the military. (Def. Ex. I).

Joseph Falanga, a certified public accountant who met Dan at Oppenheim, Appel, Dixon (OAD) in 1986 writes that Dan was a dedicated professional placing clients first. "He was serious and committed to getting the job done right. We worked 12 and more hours a day on many occasions and returned home in the middle of the night. This was a tribute to Dan's loyalty and work ethic. From my observations, Dan was a great soldier to have on your team. He was consistently exemplary. On the other hand, he did not exhibit strong leadership skills since he was always involved with

details". (Def. Ex. J).  John A. Bremont writes in his letter of November 2, 2007 that he believes that Dan Marino's remorse and desire to make amends are real and admirable and asks the Court to impose a compassionate sentence given the facts and circumstances.  He found Dan to be a fair and honorable person. (Def. Ex. K).

In Gall vs. United States, 552 U.S. ___, 128 S.Ct. 586, 76 USLW 4009 (2007), the Supreme Court held that "[a]s a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark.  The Guidelines are not the only consideration, however. Accordingly, after giving both parties an opportunity to argue for whatever sentence they deem appropriate, the district judge should then consider all of the §3553(a) factors to determine whether they support the sentence requested by a party".  Id., 128 S.Ct. at 596.

Section 3553(a) lists seven factors that a sentencing court must consider.  (1) the first factor requires the Court to consider the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the second factor requires consideration of the general purposes of sentencing including the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; to afford adequate deterrence to criminal conduct; to protect the public from further crimes of the defendant and to provide the defendant with needed educational or vocational training or other correctional treatment in the most effective manner; (3) consideration of the kinds of sentences available; (4) consideration of the Sentencing Guidelines; (5) any relevant policy statement issued by

the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities; and (7) the need to provide restitution to any victim.

There is a "general directive to 'impose a sentence sufficient but not greater than necessary, to comply with the purposes'" of sentencing described in the second factor; §3553(a). Gall, 128 S.Ct. at 597 n. 6. A district court may "not presume that the Guidelines range is reasonable...but must make an individualized assessment based on the facts presented. Id., 128 S.Ct. at 596-7. "If [the sentencing court] decides that an outside-Guidelines sentence is warranted, [the court] must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance". Id., 128 S.Ct. at 597. "The sentencing court is given due deference in the application of the §3553(a) factors...". Id., 128 S.Ct. at 597. "It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue"; Gall, 128 S.Ct. at 598 citing, Koon vs. United States, 518 U.S. at 113, 116 S.Ct. 2035 (1996).

The Supreme Court, in Gall, has made clear that sentencing courts have wide discretion to impose a sentence within the limits of reasonableness taking into account the factors set forth in 18 U.S.C. §3553(a). Dan Marino is completely deterred from ever engaging in this type of conduct again and will never hold a position from which the public would need protection. We ask the Court to impose a sentence sufficient, but not

greater than necessary, that will provide just punishment given the physical and psychological limitations which have burdened Dan Marino throughout the course of his life and which substantially and overwhelmingly contributed to the decisions he made and the actions he took while at Bayou. We ask the Court to impose a non-Guidelines sentence and to depart below the Guidelines range to a reasonable sentence taking into account Dan Marino's physical and resulting psychiatric and emotional limitations as well as his substantial assistance to the government consistent with USSG §5K1.1. We ask the Court to be as lenient as possible in this case.

THE DEFENDANT
DAN MARINO

BY _____
ANDREW B. BOWMAN
1804 Post Road East
Westport, CT 06880
(203) 259-0599
(203) 255-2570 (Fax)
e-mail: andrew.bowman@snet.net

# EXHIBIT A - REDACTED

# EXHIBIT B - REDACTED

# EXHIBIT C - REDACTED

# EXHIBIT D - REDACTED

**EXHIBIT E - REDACTED**

# EXHIBIT F - REDACTED

# EXHIBIT G

*From the desk of Ellen Marino*

November 9, 2007

Honorable Judge Colleen McMahon
United States District Judge
500 Pearl Street
New York, NY 10007

Dear Judge McMahon,

  I am aware that you are sentencing my brother in law Dan Marino whom I
have known for over 30 years. His entire family loves him, and I have had
growing concerns about his well being for some time now.

  This is a man who has suffered from severe hearing loss since he was two
years old. This is a man who, at only 14 years of age, lost his older brother
to a brain embolism. This is a man who watched his young sister try to
breathe life into their beloved 54-year-old father as he lie dead in the family
home. This is a man who suffered through the treatment for Hodgkin's
disease. This is a man who served as the primary care giver to his dying
mother as she slowly withered away from lung cancer.

  After his mother's death and his own bout with cancer Dan never seemed
the same. He put on a lot of weight and always seemed exhausted and
preoccupied. Once my daughter, my husband and I brought him a birthday
cake, and plates and napkins with happy faces on them. My daughter picked
them out to try and cheer up her beloved uncle. It seems even she knew he
looked depressed. As I searched for a plate for the cake, I stumbled upon a
cabinet full of anti depressants and other prescription meds. Concerned and
not wanting to upset my husband, I approached his personal assistant and
asked her about this. She also expressed concern worried that his doctors had
him on too many different meds.

27

Honorable Judge McMahon                11/08/07                page 2 of 2

   I didn't know much about his business, but you could see he wasn't happy. Not being either a medical doctor or a licensed psychiatrist I did the only thing I knew how to do. I prayed for him. Not long after, the news about my brother in law broke and shocked us all. My deepest fears about him became realized as we learned he had become suicidal. I keep asking myself should I have taken more action to help him. How do I explain to my daughter that her favorite uncle, who used to call her his sweetie pie, today is a broken man unable to judge the reality of a situation?

   Loss, cancer, depression, and too many mixed prescribed meds, all sent Dan on a downward spiral until he crashed, and now he needs help. Honorable Judge McMahon I kindly ask you to keep all of this in mind and to please be lenient when you sentence him. Thank you.

Respectfully Yours,

*Ellen Marino*

Ellen Marino

# EXHIBIT H

Doug Harper
214 Central Ave
W. Caldwell, NJ 07006

Honorable Colleen McMahon
United State District Judge
500 pearl Street
New York, NY 10007

November 1, 2007

Dear Judge McMahon,

I know that Daniel E. Marino, is being sentenced by you later this month. I am his brother in law and I have known him 6 years. I would like to take the opportunity to tell you about the man I have come to know over the past few years.

I am a newcomer to the Marino family and I first met Dan shortly before my marriage to his sister Elizabeth (Liz). At the time I joined the Marino family their mother had recently passed and it was a time of mourning and distress for the entire family. Like his siblings, Dan spoke of his mother and her death frequently. While her loss affected all of the siblings, because Dan had lived in the same house during her illness, Dan was the one who had to watch her deteriorate over the course of the disease. Being a cancer survivor himself made it all the more difficult for Dan.

Over the years as I have come to know Dan better, I have become friends with a man who is always happy to spend time with his family. Having no children of his own, Dan spent much of family get-togethers doting on his nephews and his niece and has been an important fixture in their lives. The children speak of him often and I believe it would be detrimental to them to be deprived of Dan's company for an extended period of time.

I'm sure you are aware that Dan suffers from a significant hearing loss. Like Dan and his brother Matthew I suffer from hearing loss, although not nearly as severe.

I can comment from personal experience about the effects of hearing loss in social and professional settings. Although a person with hearing loss is able to compensate in some ways, it is impossible to make up for all of the negative effects the disability creates. It is common for others to think you are aloof when you don't respond when spoken to from behind. When superiors give instructions it is common to miss part of the instructions or misunderstand them. Professionally, repeatedly requesting clarification or a restatement of the instructions is not always well received leaving the person with the hearing deficit in a position with the options of taking a chance at asking the wrong question or doing the wrong task. Socially, hearing loss tends to create a different set of problems, especially in venues with a high ambient background noise level. While lip reading can make up for some of the communication problems in social situations, over time hearing loss eventually causes one to become an outcast.

I "speak" with Dan over internet chat almost nightly and have done so for the last two years and I know that he deeply regrets the events that transpired at Bayou. If it were possible he would personally make everyone involved financially and emotionally whole. Since that is not possible the personal regret he carries is a burden he has to deal with 24 hours a day. He has been effectively removed from the lives of his niece and nephews and I don't believe that it is in the best interest of three children who looked up to their Uncle Dan and don't understand why he isn't able to be there now. Dan knows and accepts that he will be and should be punished, but over the last two years I have watched Dan punish himself and it has taken a terrible toll on him. I hope you will take the events Dan has suffered throughout his life into account and impose a just, but brief, sentence.

Sincerely,

Doug Harper

31

# EXHIBIT I

### Elizabeth R. Marino

### 214 Central Ave. West Caldwell, NJ 07006

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

November 4, 2007

Honorable Colleen McMahon
United State District Judge
500 pearl Street
NY, NY 10007


Dear Judge McMahon,

I am writing this letter on behalf of my brother, Daniel Marino. I was born 2 years after Daniel and I was the only female child in the home. Daniel had mumps during his childhood and developed a complication, Meningo-encephalitis, which resulted in his hearing loss. I don't recall life prior to his hearing loss, as I was quite young. What I do recall is that Daniel was always a law-abiding, generous brother. He did always seem to feel somewhat inadequate on his own, partly or mostly due to his hearing loss. He did not do as well in school as I did, or my brothers older than him, as far as I know. Nonetheless, he did go on to college and do well then. I do recall some of the time that he started working with Jim Marquez, although I never met him.

Apparently Jim was quite enamored of Daniel and wanted him to work for him alone, which Daniel did after leaving the accounting firm he was at. He was enticed to work with Jim with the promise of making a lot of money and Daniel believed him since Jim had apparently done very well in the Stock Market previously. I do recall his wanting to make enough money to help my mom after my father died and to help me not to have to work full time, since I had already developed a bad back after injuring myself in the military. He did help my mom some with house expenses as he was still living there, but I do not know the details as I was already on

my own out of my mom's house.  I never banked on anything since I am a simple person and do not expect to make tons of money, nor do I need to or want to.

I really don't know much of what transpired during the time Daniel was working with Jim Marquez and Sam Israel as I was hard at work at Medical School and then in Residency and later Fellowship and did not get to visit my mom or Dan much during that time. I do feel that Dan must have been coerced to do what he did as he never broke the law in the past and do not believe he can all of a sudden become a criminal. I trust this letter has helped you to understand Daniel better and thank you for your time.

Sincerely,

Elizabeth R. Marino

# EXHIBIT J

**Joseph V. Falanga, CPA, MBA, AEP**
**459 Ridge Road**
**Watchung, NJ 07060**

November 12, 2007

Honorable Colleen McMahon
United States District Judge
500 Pearl Street
New York, NY 10007

Re:  Daniel E. Marino

Dear Judge McMahon:

I am a partner in the tax department of The Schonbraun McCann Group LLP, a large nationally recognized public accounting firm.  I know that Daniel E. Marino is being sentenced by you this month.  Therefore, I am writing this letter on behalf of Dan.  I am under no pressure and prepare this letter of my own volition without obligation or compensation.  Although Dan and I have not been in touch for several years, Dan wrote to me recently and asked that I write this letter on his behalf.

I met Dan at Oppenheim, Appel, Dixon (OAD) in about 1986 when I joined the firm.  We soon realized that we were neighbors in Staten Island, NY and commuted together frequently.  We worked at OAD until its dissolution in November, 1990.  I believe that Dan was a senior associate or supervisor.  I was an Executive Director.  After OAD's dissolution Dan joined Jim Marquez who he admired and whose account, I believe, he worked on while at OAD.  After, Dan and I would meet for breakfast or lunch once or twice a year when I could coordinate appointments in Connecticut.

While Dan and I were at OAD, I admired him as a dedicated professional placing client service first.  He was serious and committed to getting the job done right.  We worked 12 and more hours a day on many occasions and returned home in the middle of the night.  This was a tribute to Dan's loyalty and work ethic.

From my observations, Dan was a great soldier to have on your team.  He was consistently exemplary.  On the other hand, he did not exhibit strong leadership skills since he was always involved with details.  In my opinion, Dan was not capable of formulating a plan of deception and fraud.

Many individuals that know Dan from OAD, who I occasionally see, were floored about Dan's involvement in the scandal. No one believed that he could have devised such a scheme.

It is my contention that Dan was pushed into doing what he did and that he did not exhibit the wherewithal to avoid or squelch such a deceit. Although I am not familiar with the specifics of this matter perhaps Dan's only flaw was poor judgment.

At a time when the Public Accounting profession has come under scrutiny with Arthur Anderson and other embarrassments to the profession, admittedly Dan has not helped the image of the "trusted professional".

Dan has to repay society for the wrong with which he was implicated. Dan will never be hired by an accounting firm and I assume his license was revoked. This was Dan's bread and butter. I hope you can find a way to have him repay society and our profession in a more constructive manner than to incarcerate him.

If you wish to discuss the content of this letter with me, please feel free to call me at 646-731-1537. My e-mail address is Jfalanga@smgllp.com.

Sincerely,

Joseph V. Falanga, CPA, MBA, AEP

# EXHIBIT K



Honorable Colleen McMahon

United States District Court

500 Pearl Street

New York, New York, 10007                    November 2, 2007

Your Honor,

Knowing that Dan Marino is being sentenced by you this month, please understand that his character, as I know him, is so far removed from the events of Bayou.

I have known Dan for several years and found him to be a fair and honorable person. His efforts do the right thing and fairness is a constant in his business and personnel relationships. His dealings with me have always straightforward and true to his word .The man displays focus and concentration on any matter in front of him.
During the times at Bayou, he seemed to be under tremendous pressures apparently stemming from the actions of his partners.  He relied on his partners, and trusted them.

He knows what he did wrong at the end, and he said to me "the means do not justify the end results" and "he is ashamed of all this, that he allowed them to play on his loyalty and he made a terrible mistake in who he was dealing with". His remorse and his desire to make amends are real and admirable.

I know that if he is given a chance to rebuild, and with a compassionate sentence given the facts and the circumstances of it all, he can begin again and I will be there for him.

I have full confidence In him, belief in him as a human being and I look forward to future business so he may rebuild and earn the trust of people again.


Please feel free to call me anytime.



Sincerely,

John A Bremont

President


115 East 57th Street, 11th Floor
New York, NY 10022
T 800.918.2120
F 800.918.2120

## CERTIFICATION

I hereby certify that on January 16, 2008, the foregoing Sentencing Memorandum was filed electronically.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing.  Parties may access this filing through the Court's system.  I also certify that a copy of the foregoing Sentencing Memorandum was sent by facsimile transmission on this date to Marjorie Feinzig, Asst. U.S. Attorney in Charge, Office of the U.S. Attorney for the Southern District of New York, 300 Quarropas Street, White Plains, NY 10601.

_____
ANDREW B. BOWMAN