

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

*United States District Courthouse*
*300 Quarropas Street*
*White Plains, New York 10601*

February 7, 2008

By Fax and By Hand

Honorable Colleen McMahon
United States District Judge
United States Courthouse – Room 640
500 Pearl Street
New York, New York 10007

> Re: United States v. Daniel E. Marino
> 05 Cr. 1036 (CM)

Dear Judge McMahon:

Pursuant to the Court's request, we are submitting a redacted form of the Government's letter, pursuant to Section 5K1.1 of the Sentencing Guidelines, submitted to the Court on January 25, 2008, in connection with the sentencing of Daniel E. Marino.

Thank you for your consideration.

Respectfully submitted,

MICHAEL J. GARCIA
United States Attorney for the
Southern District of New York

By:    Margery B. Feinzig
Margery B. Feinzig
Assistant United States Attorney
Tel.: (914) 993-1912

cc:    Andrew Bowman, Esq. (By Fax)

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED:    2/11/08



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

*United States District Courthouse*
*300 Quarropas Street*
*White Plains, New York 10601*

January 25, 2008

**By Fax/Federal Express – To Be Filed Under Seal**          ***REDACTED***

Honorable Colleen McMahon
United States District Judge
United States Courthouse
Southern District of New York
500 Pearl Street
New York, New York 10007

> **Re:    United States v. Daniel E. Marino**
> **05 Cr. 1036 (CM)**

Dear Judge McMahon:

The sentencing of the defendant, Daniel E. Marino, is scheduled for January 29, 2008. The Government respectfully submits this letter to advise the Court of the pertinent facts concerning the assistance that Marino has rendered in the investigation and prosecution of other persons. In light of these facts, and assuming that the defendant continues to comply with the terms of his cooperation agreement, commits no additional crimes before sentencing, and appears for his sentencing as scheduled, the Government moves, pursuant to Section 5K1.1 of the Sentencing Guidelines, that the Court sentence the defendant in light of the factors set forth in Section 5K1.1(a)(1)-(5) of the Guidelines.

## I. BACKGROUND

### A.    The Collapse of the Bayou Funds

In August 2005, a group of hedge funds known as the Bayou Hedge Funds (hereafter the "Bayou Funds," or "Bayou") and a broker/dealer known as Bayou Securities, were operating mainly from offices in Stamford, Connecticut. The Bayou Funds were formed for the purpose of obtaining contributions from sophisticated investors and earning profits by following an investment strategy of conducting short-term trading of various securities. At that time, Samuel Israel III was Chief Executive

Officer and Chief Investment Officer of Bayou Management LLC, the entity formed to manage the hedge funds and, as such, was responsible for the investment management and operations of Bayou. Marino, a certified public accountant, was Bayou's Chief Financial Officer and Chief Operating Officer.

        Over the years, the Bayou Hedge Funds obtained over five hundred million dollars in investor contributions. Unbeknownst to investors, however, Bayou obtained and retained the funds by sending to investors communications indicating that the Bayou Funds were earning profits when they were actually accumulating losses and annual financial statements that contained, among other misrepresentations: (i) inflated rates of return on trading; (ii) inflated net asset values, and (iii) certifications that Bayou had been audited by an independent accounting firm, Richmond Fairfield Associates (hereafter, "RFA"). As is now well known, RFA was not an independent accounting firm but was actually a bogus firm created by Marino after Marquez and Israel asked him to do the audit.

        A series of events culminated in the collapse of the Bayou Funds in August 2005. The last step toward the collapse came when one of the largest investors in one of the Bayou Funds, Silver Creek Long/Short Holdings LLC (hereafter, "Silver Creek"), began inquiring about Bayou's purported auditor, RFA, and requesting to inspect Bayou's books and records. Because there had been rumors that the Bayou Funds were going to be liquidated, the Silver Creek representative called Israel and asked him if the rumors were true. Israel assured him that the rumors were not true.

        According to the Silver Creek representative, shortly thereafter, Marino called the Silver Creek representative and indicated that Israel was not entirely correct, that they were going to liquidate two of the smaller funds but that additional assets were on the way, and that the total assets under management would be back to approximately $400 million. The Silver Creek representative asked Marino why Bayou was using a small accounting firm and questioned the independence of the firm, RFA, since it was the representative's understanding that it was Marino's old firm. Marino claimed that he had not been with RFA for five years and that Bayou would be changing auditors that year.

        Thereafter, according to the Silver Creek representative, Israel spoke to the Silver Creek representative again, and said that he understood that Silver Creek had grown uncomfortable with Bayou and recommended that Silver Creek redeem its investment. He also represented that Bayou had hired the accounting firm, Hertz, Herson & Company, as its new auditors and that Hertz, Herson had already audited Bayou's brokerage company, Bayou Securities. That day, pursuant to the Bayou operating agreement, Silver Creek gave 15-day notice of its intent to withdraw its entire investment and accumulated profits. In addition, Silver Creek requested that Marino allow it to: inspect the books and records of Bayou; interview representatives of RFA; examine RFA's audit work papers; and confer with Hertz, Herson to review their work papers

related to Bayou Securities and confirm their engagement. Marino agreed but said that he
had to confirm this with Israel.

According to the Silver Creek representative, on July 13, 2005, Marino sent
Silver Creek an e-mail acknowledging receipt of its withdrawal request and indicating
that the withdrawal would be made effective in accordance with the terms of the
Operating Agreement. Marino, however, refused to permit representatives of Silver
Creek to inspect the books and records of Bayou as requested. In the next few days,
Silver Creek and Marino exchanged e-mails and telephone calls about, among other
things, RFA, and the fact that Silver Creek was gathering information indicating that it
was not an independent accounting firm.

On or about July 27, 2005, all the Bayou investors, including Silver Creek,
received a letter from Israel announcing that he was closing the Bayou Funds at the end of
that month and promising that, upon completion of a final audit (which would not occur
until ninety days after the Funds closed), all investors would receive a 100% payout on
their investments. According to the letter, investors who had already sent redemption
notices would be subject to the final audit and those redemptions would be part of the
final payments. Israel's letter indicated that the Bayou Funds were closing because he
was in the process of a divorce and wanted to devote the majority of his time to his
children.

According to the Silver Creek representative, after receiving Israel's letter,
Silver Creek pressed Marino to honor his promised August 1st payment, but Marino
refused. Thereafter, Silver Creek continued to insist on receiving its redemption and/or to
inspect Bayou's records. Marino, however, refused the requests. On Friday, August 12,
2005, a Silver Creek representative flew from Washington state to Bayou's office and met
with Marino. Marino gave him a check made out to Silver Creek in the amount of
$53,089,300, its redemption. However, the check was postdated to Monday, August 15,
2005. When Silver Creek attempted to deposit the check on August 15th, there were
insufficient funds in Bayou's account to cover the check.

## B.    Marino's Confession Note

At the end of the day on August 16th, the Silver Creek representative went
back to Bayou's office to talk to Marino. Instead of finding Marino, however, he
discovered a suicide/confession note apparently written by Marino (hereafter, the
"Confession Note"). The Confession Note indicated that Marino, Israel and another
individual who had left Bayou earlier, James Marquez, had perpetrated a fraud on the
Bayou investors and provided a brief, chronological summary of the fraud. (A copy of
the Confession Note is attached as Exhibit A to the Defendant's Sentencing
Memorandum). In sum, the Confession Note indicated that from in or about 1998
through in or about August 2005, Marino, Israel and Marquez had perpetrated a fraud on

the Bayou investors, by, among other things, providing financial statements and other documents to investors and others, that contained materially false statements that, among other things, overstated gains, understated losses, and reported gains where there were losses. Further, the note indicated that in furtherance of the scheme, Israel, Marquez and Marino decided to create a phony accounting firm, RFA; Marino created RFA; RFA was held out as an independent certified public accounting firm that audited and certified Bayou's false financial statements; and, in actuality, RFA conducted no audits, independent or otherwise.

Upon seeing the Confession Note, the Silver Creek representative alerted local police, who tracked down Marino and had him go to a hospital for an evaluation. Marino was examined and released later that night. The next morning, FBI agents went to talk to Marino. Shortly thereafter, Marino retained an attorney who scheduled a proffer with the Government for the following day.

All told, based on an analysis of Bayou's records and bank records, among other things, there were approximately 392 investors in Bayou who contributed over $500 million to the Funds. Of those, approximately 288 investors lost approximately $309,713,029 in contributions to the Bayou Funds.[1] Of that money, however, approximately $100 million plus interest has been recovered.

## II. MARINO'S PROFFERS AND GUILTY PLEA

On August 18, 2005, just two days after leaving the Confession Note at Bayou, Marino participated in the first of numerous lengthy proffers with te Government. During the proffers, Marino recounted, in detail, how the Bayou Funds began and operated; how, he, Israel and Marquez were the only ones who participated in the fraud; the events leading up to the decision to perpetrate the fraud; the mechanics of how the fraud was executed; and the lengths that he and the others went to in order to conceal the fraud from the Bayou investors and employees. Marino was in a unique position to provide such details because, as Bayou's accountant and Chief Financial Officer, he was responsible for the day-to-day administration of the fraud. Much of the information Marino provided about how the fraud was accomplished has been corroborated.

### A.    Marino's Disclosures About Bayou's Early Years

During proffers, Marino filled-in, in minute detail, the account that had been laid out in summary form in the Confession Note. Starting from the beginning, Marino explained how Bayou began as one fund and how it was supposed to work.

---

[1] This includes investors who returned contributions in connection with their settlements of claims against them in bankruptcy court.

According to Marino, at the end of 1995, Israel had developed his own pattern
recognition system for trading, which would indicate when to trade particular stocks.
After another of Israel's colleagues backed out, Israel asked Marquez to start Bayou with
him. Marquez and Israel were both from New Orleans; Israel had worked with Marquez
at Marquez's previous hedge fund, HMR; and Israel and Marquez were friends. Marino,
who was a CPA, was Marquez's friend and personal accountant and had audited HMR.
When Israel and Marquez got together to operate Bayou, they asked Marino to be
Bayou's accountant.

        According to Marino, even though Israel and Marquez did not ultimately
sign a partnership agreement, according to Marino, they were partners, sharing in making
decisions for the firm, recruiting investors, and drawing the same compensation. Marino
believed that Marquez was extremely intelligent and that he was always years ahead of
the average person. According to Marino, Marquez's expertise was in the oil and gas
industry and he had been a successful trader, earning millions of dollars in trading profits.
Marino was also aware that Marquez had previously lost money trading and he explained
that Israel and he attributed those losses to timing problems, i.e., that Marquez was very
adept at picking stocks that eventually would rise in value but that it always took longer
than he said it would. Marino explained that Israel believed that with his trading
program, he and Marquez could use the program to determine when to buy and sell stocks
and overcome whatever shortcomings Marquez had in making that assessment himself.

        In 1996, Israel, Marquez, Marino and Marquez's wife Mariella, who was
doing administrative work and had contributed cash to get the business started, were the
only people working at Bayou and they operated out of an office in the basement of
Israel's home in Harrison, New York. Israel and Marquez sat together all day, did all the
trading and wrote newsletters to investors. They also met with potential investors and
Marquez did research. Marino was living with his mother on Staten Island at the time
and only worked a few days a week keeping the books.

        According to Marino, Bayou had a viable business plan that he, Israel and
Marquez believed would be successful. According to Marino, the Bayou Fund did not
charge investors the typical hedge fund management fee of 1% or 2%. Like other hedge
funds, it charged an "incentive fee," whereby the Bayou Fund would pay 20% of the
trading profits to another entity set up to manage the Fund called Bayou Management.[2]
From there, profits would be distributed to the partners. They also expected to make
money through Bayou Securities, which was an introducing broker through which the
Bayou Fund executed all of its trades. Bayou Securities generated profits by charging the
Fund (and other customers) the standard rate of $.06 a share on trades, of which $.05

---

[2]  Since Bayou never really made an annual profit, the incentive fee was based on the reported
false profits.

would go to Securities and $.01 would go to the clearing broker. Therefore, the very act of trading produced commissions. And, since they would be conducting mostly short term trading, they expected to earn a lot of money on commissions. Bayou Securities was subject to rules and regulations because it was registered with the Commodity Futures Trading Commission (CFTC) and the National Association of Securities Dealers (NASD). Consequently, Marino maintained proper records for Bayou Securities.

According to Marino, in 1997, the first full year of its operation, the Fund lost money. Marino had the idea that Bayou Securities could rebate commissions back to the Fund, without disclosing the rebate and its purpose, in detail. Marino managed to get this by Bayou's auditor, Grant Thornton, and rebated the commissions.

In around May 1998, Bayou moved from Israel's basement in Westchester to 40 Signal Road in Stamford. The rent was $25,000 a month and there was approximately 7,000 square feet of space. According to Marino, he thought this was crazy, given that Bayou was not paying any rent in Israel's basement and the 7,000 square feet of space was only being used by three people – Israel, Marquez and Marquez's brother-in-law, who, by then, had been hired as a clerk and spent his time executing trades for Marquez, who did not have a license. Marino took an office across the street. According to Marino, Marquez, wanted Bayou to move to the Stamford location because he wanted to be on the water and had previously tried to rent that office space. Shortly after moving to Stamford, they also began hiring additional staff members. Marino provided the names of all the Bayou employees, their job responsibilities, their pay, and his account of how they were able to conceal the fraud from them.

## B.   Marino's Disclosures About The False Numbers and Richmond Fairfield Associates

According to Marino, he saw the daily profit and loss runs (as did Marquez and Israel) and every other day he would input trading information into the computer. Thus, he was aware that the Fund was not doing well. By August of 1998, he believed Bayou was in a lot of trouble and could not survive an independent audit and he voiced his concerns to Israel and Marquez. Marino recalls that on December 30, 1998, he met with Israel and Marquez in a conference room at 40 Signal Road. The loss for the Fund was high and there were not enough commissions to rebate to cover the losses. During the meeting, Israel and Marquez told Marino that they wanted him to prepare the Fund's audit, instead of Grant Thornton. Marino recalls that he indicated that he could not audit the Fund because he was not independent, but Israel told Marino that because Marino did not have an ownership interest in the Fund and was just the bookkeeper, he could do the audit. Marino told Israel and Marquez that he wanted a videotape saying that he should do the audit. Israel said that he would swear on a video that Marino had nothing to do with this plan. (According to Marino, the videotape was never made and Israel and Marquez later told Marino to go "f-- himself.") Marino asked what would be in it for him

and Israel told him to do the audit and they (Israel and Marquez) would cover "the problem," which was how they all referred to the losses. Israel took out a life insurance policy naming Bayou Securities as the beneficiary, in order to pay everybody back in case he died before he had a chance to earn back the money.

Marino further admitted that, shortly after that meeting, he created RFA. Marino initially just had a mail drop in lower Manhattan and a phone number for RFA. Later, he rented office space in mid-town. RFA also had a web-site that Israel set up. According to Marino, over the course of time, he received some calls at RFA and would pretend to be either "Matt Richmond" or "Dan Richmond." Some of the calls were to verify the firm or to ask questions about financials or K-1s.

Marino admitted that the financial statements for the Fund, which were issued in the name of RFA, were actually created and issued by him, and were false because, among other things, the profits were false. According to Marino, in the beginning, Israel and Marquez determined what the phony rates of return and false profits would be. The same percentages would be shown across the board to all investors. If there was a profitable month of trading, that number was reflected. If there was a big loss, a smaller loss would be shown. In the early years, net asset valuations (NAV's) were sent to investors on a quarterly basis and Israel and Marquez came up with the NAV amounts. Later, they were sent out every month. According to Marino, Israel and Marquez never made enough to cover the false numbers being reported.

Marino recounted that in the second quarter of 1999, he was diagnosed with cancer. Between July and December of that year, he was receiving chemotherapy. At or around the same time, Marino's mother, who he lived with, was also diagnosed with cancer and he was her primary caretaker. As a result, he was only periodically going to work at Bayou. Marino's mother passed away on January 1, 2000 and during the early part of that year, Marino received radiation treatments and continued to work only sporadically. Some time in early 2000, Marino came back to work. Marquez and Israel were still losing money and still perpetrating the fraud by providing the investors with false numbers.

Meanwhile, in or about 2000, Bayou opened its first offshore fund in the Cayman Islands. The investors in that fund received the same false information as the onshore Bayou investors. Marino explained how the offshore fund operated, including that when investors contributed to the offshore fund, the money did not stay in the Caymans, but was transferred to Bayou's account in the United States. The offshore Fund was subject to auditing so Marino employed accounting firms and others to handle accounting and money laundering compliance issues. Marino also attempted to manage the offshore fund by hiring a well known hedge fund administrator. To get by the auditing, Marino moved profitable trades from the domestic Fund to the offshore Fund. The offshore accounts were closed about 14 months after they were opened because the

administrator was uncomfortable with the constant cancelling and re-booking of trades. Moreover, even assigning the profitable trades to the offshore accounts was not enough and they attempted to give back commissions. The auditors balked, however, and the offshore fund had to be closed.

### C. . Marino's Disclosures About The Israel/Marquez Split

According to Marino, Israel blamed Marquez for Bayou's losses and tensions between the two increased over time. According to Marino, Marquez wanted to turn Bayou into a long term holding portfolio; Israel preferred short-term trading, akin to day trading. In addition, Israel came to believe that investors did not trust Marquez with their money and suspected that Bayou could raise more money from investors without Marquez. That belief became concrete when, in around mid to late 2000 or early 2001, a potential investor refused to contribute to the Fund if Marquez was there. Thus, Israel decided Marquez had to leave and Marino convinced Israel to just have Marquez move across the street to 27 Signal Road, where Marino had an office. That way, Marquez could continue trading and go into his own stock research business from there.

According to Marino, however, there were still problems between Israel and Marquez even with some physical distance between them. Thus, shortly after moving across the street, Marquez sent three handwritten letters to Israel and Marino (who described himself as a go-between for the two, who were barely speaking), in which he discussed his role at Bayou and laid out his view of his future relationship with Bayou and ultimately, the financial terms of his break with Bayou. Marino explained that when Marquez moved across the street, Marquez believed he should be paid for his interest in Bayou. Indeed, Marino described a meeting at his office at 27 Signal Road ⅃                                              ⸱. During that meeting, Israel refused to pay Marquez anything, telling him that until "the problem" was solved, Bayou was not worth anything.

Ultimately, they came to an agreement, which Marino explained. First, Bayou set Marquez up in the office across the street, paid some of his expenses, and paid him $12,500 a month in "consulting fees" that mirrored the distributions he took at Bayou.                    ⁚                                                ⁚

According to Marino, Marquez's expenses and monthly commissions were netted against the commissions he earned and after that, there was little money left over to pay off the losses. Thus, rather than applying the leftover commissions to repaying the losses, Bayou paid Marquez the remaining commissions.

In July 2001, Marquez was retained to raise capital for an energy company then known as KFX and he proposed that Bayou buy stock in KFX on the assumption that when the value of the stock went up, Bayou would earn a great enough profit on the

investment to cover Bayou's losses, which, by then, amounted to approximately $6 million. Israel ultimately agreed and Bayou purchased one million shares of KFX, along with 500,000 warrants to purchase additional share of KFX, for approximately $3.6 million. According to Marino, in 2004, three years after Bayou invested in KFX, (which, in Marino's and Israel's view, was consistent with Marquez's history of having "timing problems") KFX share prices finally rose and Bayou's shares in KFX were sold, netting Bayou approximately $12 million.[3] According to Marino, in Marquez's mind, this was how he got out of "the problem" with Bayou.

### D.    The Post-Marquez Era at Bayou

After Marquez moved across the street, Marino moved his office into Bayou's space, and, although he and Israel also did not sign a partnership agreement, Marino became Israel's partner and went by the title Chief Financial Officer. In 2002 and 2003, Bayou grew exponentially. Marino and Israel closed the original fund and opened four domestic hedge funds – Bayou Accredited Fund, LLC, Bayou Affiliates Fund, LLC, Bayou No Leverage Fund, LLC, and Bayou Superfund, LLC – as well as offshore funds in the Cayman Islands. The Bayou Funds raised hundreds of millions of dollars from investors. In addition, Bayou hired numerous employees, including more traders, salespeople, support and administrative staff.

The newly named Bayou Funds, however, fared no better with Israel solely in control of investment strategy and Israel and Marino continued to disseminate false performance numbers and financial statements certifying that Bayou's books had been audited by RFA. According to Marino, Israel was having personal problems as well in that he suffered with serious back problems, underwent two back operations, and was using substantial amounts of pain medication. Additionally, Israel and his wife split up and he had to move out of his home. Israel was doing much of his trading from his Westchester residences and Marino was running the office in Stamford.

Marino continued to write the annual financial statements (using false numbers worked out by Israel and ultimately Marino as well) that were falsely certified and issued by RFA. In addition, Marino created the monthly net asset valuations that informed investors what their investments were worth. Much of Marino's responsibilities involved keeping the fraud concealed. Thus, Marino answered calls from investors who had questions about Bayou or RFA. In order to keep the fraud concealed from employees, Marino kept the employees who worked in the trading room separate from those who handled administrative and investor related operations. Moreover, by

---

[3]  On 12/31/01, Marquez purchased the warrants attached to Bayou's stock for $25,000. Marino signed the documents transferring the warrants to Marquez, in Israel's name. There is a dispute as to whether Israel authorized the transfers.

compartmentalizing the trading operation and the administrative/investor related
functions, Marino succeeded in preventing employees of one department from looking at
documents relating to the operations of the other departments. There were other
circumstances when Marino was called upon to take steps to conceal the fraud. For
example, when Israel became involved in divorce proceedings, Marino took charge of an
effort to prevent Israel's wife's attorneys from gaining access to the Bayou Fund's
records, for fear that they would discover the fraud. In another example, towards the end
of Bayou's existence, when one investor (other than Silver Creek) was asking questions
about RFA's independence, Marino had            draft a fraudulent document
purporting to be an agreement indicating that Marino had sold RFA years before, which
Marino intended to send to the investor.

### E.   The Venture Capital Investments, Prime Bank Fraud and Collapse of
the Bayou Funds

Throughout the years, apparently as a way to make money (both to make up
for losses and to profit Marino and Israel personally), Marino and Israel invested Bayou
investor money in numerous venture capital projects, which, in most cases, were
legitimate deals but were very risky. The transactions involved movie deals, real estate
deals, an international money transferring firm, a software company, a commuter aircraft
manufacturer start-up, a clothing designer, and a French cable company, among others.
In all, they invested approximately $40 million. Marino was primarily responsible for
administering these investments and he admitted that none of them were disclosed to
investors nor were they investments that Bayou was supposed to be making with Bayou
investors' money. Many of them were made through partnerships set up by Marino and
Israel known as IM Partners and IMG LLC.

In another attempt to make money, in 2004, Israel decided to invest Bayou
investor dollars in a series of so-called "programs" that would earn fantastic rates of
return and that were, in actuality, prime bank frauds that were perpetrated against Israel
and Marino.

Hon. Colleen McMahon

According to Marino, while Israel was traveling to Europe trying to get the money invested in the programs, no trading was going on at Bayou. Marino was back in Stamford, putting off employees and browbeating them into not asking questions about why Israel (and therefore, Bayou) was not doing any trading. He told them, among other things, that: Bayou was opening a trading operation in Europe; Israel was establishing contacts there and meeting with potential clients; and they should get themselves prepared because a lot of money was going to be coming in. In the last few days before he wrote his Confession Note, Marino finally began telling employees that they might want to start looking for new jobs, in case things did not work out.

wire fraud, in violation of Title 18, United States Code, Section 1343. As a result of his plea, Marino faces a maximum sentence of fifty years' imprisonment.

In addition, pursuant to the cooperation agreement, Marino agreed to forfeit all his assets, including (a) $450 million, representing the amount of proceeds obtained as a result of the offenses; (b) the approximately $100,010,673.68 seized by the Arizona Attorney General; (c) $155,747 in cash resulting from the sale of his two automobiles; (d) all proceeds of the sale of his residence in Westport, Connecticut; (e) his interest in any entities or partnerships, including but not limited to, IM Partners and IMG LLC, and any and all assets, including bank accounts; and (f) his interests in any bank accounts and/or brokerage accounts.

## III.  SUBSTANTIAL ASSISTANCE PROVIDED BY MARINO

### A.  The Seizure of Bayou's Records and the Recovery of Investor Funds

Prior to his first proffer with the Government on August 18, 2005, Marino consented to a search of Bayou's office in Stamford and the seizure of all of Bayou's records and computers. In addition, Marino consented to the search of Bayou's storage space at a warehouse in Stamford, where the Government recovered additional records maintained by Bayou. A short while later, Marino consented to a search of his home and he turned over to the FBI documents and records relating to the private venture capital investments he and Israel had made using Bayou investor funds. Marino also turned over copies of computer files that had been on a laptop computer at his home, again, relating mostly to the private venture capital transactions. Marino's immediate consent to the Government's search of Bayou's offices and storage space and seizure of Bayou's records and computers saved the Government a great deal of time and effort that would have been dedicated to obtaining search warrants and it facilitated the Government's effort to efficiently secure valuable evidence.

During his proffers, as well as additional meetings with the Government's Court appointed receiver, Marino identified and explained the nature of the private venture capital transactions in which he and Israel invested and provided contact information for the parties and professionals who participated in the transactions. Further, Marino disclosed that he issued loans to members of his family and friends. He provided the Government with the names and contact information of the borrowers and the amounts of the outstanding loans. The information regarding the venture capital transactions and the loans has been helpful in the Government's effort to try to recover some of the tens of millions of dollars in investor money invested in the private venture capital transactions and to have the loans repaid.

During proffers, Marino also provided the Government with the names of the banks where Bayou conducted its banking and the brokerage firms where Bayou

executed its securities trading, again, saving the Government time and resources it would
have spent trying to determine where Bayou's bank and trading accounts were located.

Finally, Marino identified all of his assets that were obtained through the
proceeds of the fraud – including his residence, two luxury cars, his pension money, and
cash in certain bank accounts – and he has agreed to forfeit those assets.

## B.    The Convictions of Israel and Marquez

Perhaps most significantly, however, as described above, Marino
immediately admitted that a crime had been committed (and not just that investors lost
money due to poor trading), provided the details about how it was committed, and
identified the other people who participated in the fraud. Without that information, the
Government would have had to go through the lengthy and tedious process of examining
almost a decade's worth of the Bayou Funds' trading records, financial disclosures and
bank records to ascertain what had happened and what the losses amounted to. That
analysis, alone, may have taken months, if not years.

Israel pled guilty on September 29, 2005, the same day as Marino, to a three
count Information charging him with one count of conspiring to commit mail fraud and
investment adviser fraud, from in or about 1996 through in or about August 2005, in
violation of Title 18, United States Code, Section 371; one count of investment adviser
fraud, in violation of 15 U.S.C. §§ 80b-6 and 80b-17; and one count of mail fraud, in
violation of Title 18, United States Code, Section 1341.[6] As a result of his plea, Israel
faces a maximum sentence of thirty years' imprisonment. The Government understands
that Marino and Israel consulted with counsel together and had discussed coming forward
to cooperate. Marino ultimately wrote the Confession Letter, consulted with his own
counsel, and came in first. Israel began proffering six days later. It is probably fair to say
that they each played a role in the other's decision to admit his guilt and enter a guilty plea.

Marquez pled guilty on December 14, 2006, pursuant to a plea agreement, to
an information charging him with conspiring to commit investment adviser fraud and mail
fraud, from in or about 1996 through on or about October 19, 2001, in violation of Title
18, United States Code, Section 371. On January 22, 2008, Marquez was sentenced
principally to a term of 51 months' imprisonment. At the time Marquez entered his guilty
plea, he was aware that Marino and Israel had already pled guilty and that Marino's
Confession Note implicated him. In all likelihood, he was also aware that Marino was
cooperating with the Government and all this information played a role in his decision to
plead guilty.

---

[6] Israel did not enter into a plea agreement with the Government.

Marino's information was significant to the Government's prosecution of
Marquez and became especially important during the time leading up to Marquez's
sentencing, when Marquez was disputing his role at Bayou. As described above, Marino
was privy to the details of Marquez's position and responsibilities at Bayou, his
participation in the fraud, and his eventual removal from Bayou. Marino's perspective
was important because he had been Marquez's friend and personal accountant and because
he was the only person, other than Israel, who knew about the fraud and Marquez's role in
it. Marino was able to explain the key pieces of evidence against Marquez in which
Marquez implicated himself in the fraud and revealed how he viewed himself in relation to
Bayou and the fraud – the three letters Marquez wrote to Israel after he had moved across
the street and attempted to negotiate financial terms for his split with Bayou. Marino also
was able to explain what financial terms Marquez obtained (a years worth of pay, expenses
to start his business, and consulting fees), and how the KFX transaction was the final step
toward the end of Israel's and Marquez's business relationship. Marino was especially
helpful because he was able to provide a detailed, chronological account. Marino's
account of Marquez's role at Bayou was corroborated, in large part, by other witnesses and
Bayou records.

    **C.    Marino's Failure To Disclose            Activities**

## CONCLUSION

Despite Marino's failure to disclose        conduct, Marino has
proven to be a very helpful cooperating witness. As described above, his immediate
decision to cooperate saved the Government a tremendous amount of time and resources.
From the beginning, he has been remorseful and has accurately and truthfully recounted
his role and the roles of Israel and Marquez in the fraud. With respect to his own conduct
and that of Marquez and Israel, he never minimized his own role and consistently
described their roles accurately. His cooperation contributed to the guilty pleas of
Marquez and Israel and to the ongoing recovery of investor funds. Moreover, Marino
always made himself available to the Government and the Government's receiver, when it

Hon. Colleen McMahon                                                          16

was requested, to proffer and answer further questions.

For the foregoing reasons and assuming that the defendant continues to comply with the terms of his cooperation agreement, commits no additional crimes before sentencing, and appears for his sentencing as scheduled, the Government moves, pursuant to Section 5K1.1 of the Sentencing Guidelines, that the Court sentence the defendant in light of the factors set forth in Section 5K1.1(a)(1)-(5) of the Guidelines.

Thank you for your consideration.

Respectfully submitted,

MICHAEL J. GARCIA
United States Attorney
Southern District of New York

By: _Margery B. Feinzig_
     Margery B. Feinzig
     Assistant United States Attorney
     Tel. No.: (914) 993-1912

cc:    Andrew Bowman, Esq. (By Fax)