

05-cr-1036-01 (cm)

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 4/8/08

January 27, 2008

The Honorable Colleen McMahon
United States District Judge

Dear Judge McMahon:

I write to express my regret, my remorse and my sense of shame concerning my actions at Bayou and the losses I contributed to.

For the last 2½ years I have tried to assist the government in its investigation and to assist both the government and the court appointed receiver in the recovery of assets. I have never sought to minimize my role or the nature or degree of what I did. To the investors, I can only offer my apology and I have attempted to demonstrate my remorse through my efforts over the past 2½ years.

Looking back, my years at Bayou included the most tragic events of my life. What I am about to say is not offered as an excuse but I hope to put in some context why I participated in the commission of the offenses to which I have pled guilty.

When I went to work for Jim Marquez at HMR, my view of Jim was one of tremendous admiration. He appeared to be a brilliant trader and investment advisor. He dealt in a world that until that time was far from my own. My duties at HMR were to reconcile trades, pay bills, order supplies and do whatever needed to be done administratively. I did not audit HMR. Grant Thornton was the auditor for HMR.

I led a very isolated life, and the world of Wall Street was something I could only look at from a distance. That world came closer to me when I worked as an accountant for Jim Marquez.

Although HMR was not as successful as anticipated, when Marquez decided to close HMR down, he and Sam Israel offered me what I thought was a great opportunity to work at a new hedge fund.

I started part time, commuting from Staten Island to Westchester where Bayou was being run out of Sam Israel's basement. I had no trading ability or experience, and I never sought that role. I believed that Sam Israel and Jim Marquez had the ability to operate a very successful hedge fund, and that was what I anticipated would happen.

Bayou began incurring losses in 1997. In late 1997 Sam Israel, Jim Marquez and I discussed whether we could rebate commissions from Bayou Securities to Bayou Fund which I believed was permissible under the law. Grant Thornton was the auditor, and a dispute arose over the language that was to be set forth in a footnote to the financial statement. It was not whether one could lawfully rebate commission but rather what needed to be said about it to the investors. Based upon the footnote, it was not apparent to the investor who read the financial statement how much of the profit of Bayou Fund was based on trading and how much was based on the commission rebate.

The losses at that time were small enough that the commission rebate in all likelihood to the best of my recollection brought the fund to a profitable position. Although we have stated in footnote 1 in the Sentencing Memorandum that the amount of the rebate was $400,000, I have since been able to review a document which indicates that the commission rebate was approximately $180,000.

In late 1998 Sam and Jim called a meeting during which Sam explained that the losses had gotten so large that he felt Bayou could never survive an audit. He and Jim asked me if I could do the audit, since I had no ownership interest in Bayou and was therefore independent. I explained that I was not independent. Both Sam and Jim together and separately told me that by me doing the audit, it was the only way they could save their careers and even their lives. I agonized over the decision, and approximately a week later, I agreed to do it and utilize Richmond Fairfield Associates as the name for the auditor. I believed that Sam and Jim had the capacity to make Bayou profitable. Because of my experience seeing Jim Marquez make over a 100% rate of return in 1994 after incurring losses over the period of the prior 3 years, I honestly believed that both Jim and Sam had the ability to trade profitably, make the money back and rectify the problem. I never anticipated at that time that the losses would grow to such a degree. The decision I made was wrong and I deeply regret it.

I have asked myself many times why I did not leave Bayou. While in the years before 1999, Bayou was the most important thing in my life except for my family, after 1999 Bayou became virtually the only thing in my life.

During early 1999 I experienced symptoms which after three months led to a diagnosis of Hodgkins Lymphoma. I believed I would die. I did chemotherapy weekly from the summer through the end of 1999, and at the same time I took care of my mother in Staten Island who was dying from lung cancer. I was out of the office completely from late July through December 1999. She died on New Years Day 2000, and until that time, she was the most important person in my life.

In November 1999 I stopped going for chemo at Staten Island Hospital for about one week. The hospital called and asked me to come to the hospital to speak with my oncologist. When I agreed to go, they again reiterated the importance of chemotherapy in the treatment of Hodgkins and the statistics if I complied. They questioned why I didn't want to continue, I came close to confessing but couldn't. I wanted to believe Sam and Jim could make Bayou profitable as they continuously said they could. I told them the truth about my mother who was dying before my eyes but only vaguely about the business. I was sick with cancer and despair, since from my phone calls with Jim and Sam I realized that their antagonism toward each other continued and so did the losses. Marquez and Israel told me don't worry, but things were completely out of control there, and I just couldn't bear it.

When I finished chemotherapy at the end of 1999 and with the loss of my mother, I returned to Bayou the second week of January 2000 and found that Israel and Marquez were more antagonistic toward each other than ever. This antagonism had existed almost from the beginning and was not contributing to the success of the fund. I didn't know what to do about it, while at the same time the doctors advised that I would have to start radiation which I did from January through April 2000, twice a week. I was undergoing radiation in Staten Island and coming up to Stamford when I could. I continued to live at home in Staten Island until the end of July 2000 when I moved to Stamford.

During the third week in January 2000 when I was undergoing radiation, I skipped a session and the oncologist's assistant called. I told her my mother had died, the business was being destroyed and I couldn't deal with it anymore. She called the police, and the EMTs came to my house. They wanted to take me in for a psychiatric evaluation. When I refused they cuffed me and took me to the psychiatric ward. They released me after 4 hours.

The doctors told me that one is more likely to be cured of Hodgkins if I survived the first five years. After five years there is only a 5% - 10% chance of recurrence. As prescribed, I went for CT scans every six months, since if there were a recurrence there was a 90% chance it would happen during the first five years.

Throughout the remaining years, I was haunted every day by what was happening, but I could not end my relationship with Bayou or Sam Israel. I desperately wanted Bayou to succeed, but it didn't, and I sank deeper into depression and despair.

When I left my confession and started cooperating with the government, I gave them whatever I had. I moved out of the house in Westport, because I could not bear to look at it, liquidated whatever assets I had and gave the proceeds to the government. I have tried to tell the government and the receiver everything I can to assist them.

3

I am 48 years old and I do not know how long I will live. The latest prognosis is that I have a 20% chance of developing multiple myeloma, an incurable cancer. I can't really get a straight answer as to whether the fact that I have already had a different form of cancer, Hodgkins Lymphoma, makes it more likely or less likely that I will actually develop full blown myeloma.

I live alone in a room in Bridgeport and I have had a great deal of time to think. While anyone you ask would never trade their lives for mine, I do believe that there is value to my life and that I can contribute something positive to the world. I do have a conscience, and no matter what my medical limitations have been, no matter how isolated I have felt by virtue of my hearing loss and my resulting speech impediment, nothing has been harder than living with the knowledge that I caused financial loss to others.

I hope that you will take who I am into consideration along with what I did and if you can, I hope you will grant me leniency.

Respectfully,

DANIEL MARINO